MILTON F. JORDAN AND ELLA JORDAN v. WILLIAM E. DE GOLIA AND CARRIE DE GOLIA.

*Mortgage—Absolute conveyance—Accounting.*

On a review of the evidence, the Court find that the deed executed by complainants to defendant William E. DeGolia, and which complainants seek to set aside, was actually delivered, and that it was given as security, and must be treated and deemed a mortgage upon the premises therein described, and an account is stated between the parties. No questions of law are involved.

Appeal from Barry. (Hooker, J.) Submitted on briefs February 19, 1892. Decided April 15, 1892.

Bill to set aside a deed. Defendants appeal. Decree reversed, and one entered declaring the deed a mortgage, etc. The facts are stated in the opinion.

*Stuart & Knappen* and *John Carveth,* for complainants.

*Ward & Ward,* for defendants.

MCGRATH, J. This is a bill filed to set aside a deed. Defendants claim that the deed was given to secure an indebtedness, and ask for an accounting.

Milton F. Jordan is an attorney, and William E. De Golia had been in the insurance business. They had been partners for a number of years. In 1887, Jordan was postmaster at Middleville, and De Golia was his deputy. The partnership had been dissolved, but the parties officed together over the post-office. De Golia was carrying on the insurance business, and afterwards established a lumberyard. Jordan seems to have had some difficulty with his wife, and in March, 1887, exe-

cuted a deed of three parcels of land to De Golia. Jordan explains why this deed was given, as follows:

"In consequence of myself and wife settling our affairs, Mr. Carveth and Mr. Hendrick, representing her, suggested that I should deed a portion of my property in Mr. De Golia's name, he being a single man,—that portion my father held in Irving,—simply for convenience; and the deeds were so made out to Mr. De Golia, covering 40 acres in Irving, a harness-shop, and the house and lot in question."

After the execution of this deed, Mrs. Jordan left Middleville, remaining away for some time. While she was away, Jordan boarded with De Golia. The deed was not delivered at this time, but in July, 1887, De Golia became surety on an appeal-bond for Jordan, and, to secure De Golia, Jordan gave him an order on Carveth & Hendrick for the deed, and the deed was delivered to De Golia. In December, 1887, De Golia indorsed Jordan's note for $270. About this time Jordan represented to De Golia that an arrangement had been made to settle the appeal suit, and requested a reconveyance of the property for the purpose of negotiating a loan thereon, in order to take up a mortgage which was then upon the property. De Golia, according to Jordan's story, agreed to reconvey, if Jordan would execute a chattel mortgage to secure De Golia. Jordan assented, and De Golia reconveyed. The chattel mortgage to De Golia was not executed until some time in January, 1888. Jordan claims that it was to secure De Golia against liability on both note and bond. Jordan says that in February, 1888,—

"Mr. De Golia had become alarmed, and came to me, and wanted I should— He said he had a deed of that property to secure him on the attachment suit; that I had represented to him that the attachment suit was as good as settled,—nothing would come from it; and he desired me to make a reconveyance of these lands to him

as a security upon that attachment suit. I went on, and stated to him that I was satisfied the suit would be settled, and told him that I had had a conversation with Mr. Hendrick, and that he had partly agreed upon a settlement of the matter. He told me that Mr. Hendrick did not say the same to him; that he had just talked with Mr. Hendrick, and he thought it would go to judgment. I showed him my stub-book or my check-book—a note I had in my possession against the party—to satisfy him that there wouldn't be any liability on that attachment suit. It didn't satisfy him. He insisted that I should make a deed. I then told him that I had deeded 40 acres to my father,—the 40 acres in Irving,—and that there was the harness-shop, and the house and lot was still going to the wife. He wanted me to make a conveyance of the house and lot and harness-shop. I did so. I told Mr. De Golia, I says: 'The matter is as good as settled; if you wish, I will have the deed made.' I had a deed made. Went and saw Mr. Hendrick, and they had an arrangement about a settlement of the suit, and I so informed Mr. De Golia. The deed remained for several months in a pigoon-hole in the post-office, and it was placed on the desk in the pigeon-holes. I had papers I put there for convenience. This deed was placed among other papers, and remained there for a long time, until a short time before suit in ejectment was commenced—notice to quit was commenced—by Mr. De Golia. It was nearly a year after the settlement of the attachment suit. I took that deed up-stairs in the law office; put it in the pigeon-hole with some other of these papers that I didn't deem of consequence enough to put in the safe. I placed them up there, and that is the last I ever saw of the deed, or ever knew of its whereabouts, until about the time the ejectment suit was commenced."

The pigeon-hole in which Jordan claimed to have finally put the deed was in a desk used by both parties in common. It was claimed by Jordan that the deed was never delivered to De Golia. Although executed in February, 1888, the deed was not recorded until March 13, 1889. In the mean time, and after this deed was executed, De Golia released his chattel mortgage security, and had

by November, 1888, indorsed a second note of $200 for Jordan. Suit had been brought on both notes, and, just before recording the deed, two judgments had been rendered on them, and De Golia had paid both judgments. De Golia denies that he took the deed from the pigeonhole, and says that he received the second deed from Carrie De Golia, his wife, and the wife says it was given to her by Jordan for DeGolia. Jordan, upon cross-examination, says:

"It seems to me that, previous to this time the deed was recorded. I delivered a paper to her from Hastings. I don't know what the contents was, but that wasn't when she was at her sister's."

De Golia insists that Jordan was involved; was trying to keep his property under cover; and that the note dated in December, 1887, was a renewal of a former note, upon which De Golia was indorser. After paying both judgments, De Golia says he was advised that he could get possession of the premises, and commenced proceedings before a circuit court commissioner to that end. He says he had no knowledge of the execution of the chattel mortgage to him; that he never had possession of it; and that Jordan had executed that as well as other chattel mortgages to him for his (Jordan's) own convenience, and to protect the property.

The undisputed facts are that complainants had executed a deed of the three parcels of land to De Golia; that, whatever may have been the original purpose of this conveyance, it was delivered to DeGolia to secure him; that, before DeGolia had been released from liability, he surrendered this security; that he afterwards insisted upon a reconveyance; that such reconveyance was duly executed by Jordan and wife; that, after such execution of the deed, De Golia still continued to be liable as indorser upon Jordan's paper; that the deed so executed is

found in De Golia's possession, and has been recorded by him.

It is said that the deed, although executed February 11, 1888, was not recorded until March 13, 1889, but the former deed, although delivered in July, was not recorded till October. The judgments were rendered March 5 and 9, 1889, and in the mean time Jordan had been promising to take care of the notes. The judgments were paid by De Golia, March 11 and 14, 1889. It is not unusual for parties holding conveyances as security to keep them from the records. These parties had been intimate, and their relations seem to have been undisturbed until about this time. Immediately after recording the deed, De Golia commenced proceedings to oust Jordan.

Again, it is said, that in February, 1889, De Golia drew post-office orders to the amount of between three and four hundred dollars, in his own favor, and, when asked why he had drawn them, he replied that it was done to secure himself against these notes; and it is urged that he would not have taken this course if he, at that time, held this security. That does not follow. At this time one of the notes had been sued upon, and a suit was likely to be instituted upon the other. His security was upon mortgaged property, and it is not strange that De Golia should take a summary way of enforcing payment by Jordan and of avoiding payment himself.

There are other circumstances that tend to corroborate the theory of defendants. Jordan insists that the only purpose of the execution of the last deed was to secure De Golia against liability upon the appeal bond in the attachment suit, but at the same time the chattel mortgage, according to Jordan's testimony, had been executed to secure De Golia against his liability as indorser as

well, and the chattel mortgage was discharged about the time of the alleged delivery of this deed. Again, Mrs. Jordan says that, when she asked Jordan what the purpose of this deed was, he said that he expected to use it for the purpose of raising some money. According to complainants, this executed deed was for months left in a pigeon-hole in the post-office, and then taken by Jordan from that pigeon-hole to the office occupied by Jordan and De Golia, and placed in a pigeon-hole in a desk used in common by both parties. Jordan says that the deed remained in the post-office until a few weeks before the suit to eject him was commenced, but De Golia insists that he had before that time sold out his insurance business, and had built an office at his lumber-yard, and had not from that time had access to the office. Jordan says that the deed was among the papers taken to the up-stairs office, but Mrs. Jordan says that she only knows the fact that Jordan cleaned out the pigeon-holes in the post-office, and put some of the papers in the safe, and took a part up-stairs. She also says that she saw the deed several times in the post-office, because she took it out and read it a number of times. Neither claims that it was seen in the office after Jordan says that he took it there. Complainants' testimony places the deed where it might be taken by De Golia, but they place it there too late, under De Golia's testimony, to be taken by him, unless he broke into the office, and took it.

Complainants insist that the deed was abstracted after De Golia commenced his suit, and after he had learned that Jordan claimed that the second deed had been left at the office, but this theory cannot be supported. It would be much easier to concoct a story based upon the deposit of the deed in the office by Jordan than upon a delivery by Jordan to Mrs. De Golia. There is no showing whatever that the office was broken into, that De

Golia had a key, or that he had access to the office, although either could have been proven if such were the fact. There is no question but that De Golia's liability culminated in the payment by him for Jordan of these judgments, and that the indebtedness from Jordan to De Golia continued, for after this bill was filed Jordan paid De Golia on account the sum of $100. The fact of De Golia's liability, his demand for this very conveyance, and the execution of this conveyance in response to that demand, and the continuance of that liability, are potent circumstances corroborating defendants. No reason is given by Jordan why it was not delivered, although De Golia had asked for it, and although it was executed for that purpose. We find, therefore, that the deed executed by complainants to defendant William E. De Golia was actually delivered, and that it was given as security, and must be treated and deemed a mortgage upon the premises described therein.

The next question is the one of the accounting. On March 11, 1889, De Golia paid one judgment, amounting to $205.69. On March 14, 1889, he paid the second judgment, amounting to $290.32, making a total of $496.01. Complainants insist that there is nothing due to the defendants, and bring in items of offset more than sufficient to wipe out the amount of the judgments; but after the commencement of this suit, and several months after complainants had paid to defendants the $100, hereinbefore referred to, on June 14, 1890, Jordan wrote to De Golia a letter, the first paragraph of which is as follows:

"*Friend Will:* I found your letter after coming home. In reply, will say your proposition is fair and reasonable. I meant to have talked further with you on the subject of settlement while there, but so much else going on about deals. Now, we will let the matter go over the term without costs or term fee, and, if I cannot get a

deal for something you will take in a few days or weeks, I will cancel all matters, and give you a mortgage for all dues. I want you to have your money. I want nothing else, for nothing else is right for me to do."

After the writing of this letter, it is conceded that Jordan offered to pay De Golia the sum of $150 to settle the matter, but De Golia declined to receive it. This letter, and the refusal of De Golia to accept of the offer of $150, are entirely inconsistent with the claim that at this time complainants were not indebted to defendants.

Complainants seek to offset, against the above amount, five items, aggregating $305.08, which arose prior to June 26, 1888, in the course of the post-office dealings. One charge of $20 is alleged to have been money borrowed from the post-office funds, and the others are alleged to have been post-office orders drawn by De Golia for his own use without depositing the amount or fees. These items are represented by slips, which De Golia made when the orders were drawn, and deposited in the money-order drawer, and, according to Jordan, these slips were treated as cash. One of these charges is for an order of $100, and fees, 45 cents. The order was drawn in November, 1887. There were other parties in the office, and a dispute arose regarding it, but De Golia insisted that he had paid in the money before he left the office, leaving other parties in the office, and he refused to make good the amount. Although De Golia continued to draw orders until February, 1889, no claim or charge was ever made against him for the amount, nor was the matter alluded to until the hearing in this suit. It was shown that it was the custom to carry forward these balances from slip to slip, but this amount was not carried forward or charged up against De Golia upon any book, account, or slip. Respecting the other items, they are obtained from slips. It does not appear

that the amounts were carried forward into other slips, as was the custom, but individual slips are here presented. The last slip is dated June 22, 1888. De Golia continued in the office until some time in 1889, and drew orders until February. The amounts of these slips were nowhere charged up to him. He presents his own book of account, showing the post-office account balanced in September, 1888. The items of the account, as it appeared upon his book, were not gone into on cross-examination.

In February, 1889, when suits were threatened upon the notes indorsed by De Golia, he drew post-office orders amounting to about $400, in order to force pay-ment of these notes. It is a little strange that if at this time these charges were against him, aggregating over $300, Jordan did not say, " You already owe $300, which, with the $400, makes $700, while the whole amount of the notes is less than $500," instead of saying that out-side matters must be taken care of on the outside. Other items of account are presented, aggregating $126.50, including one item for six days' services, at $10 per day. Defendants do not dispute the items, except the item of $60 for services. As to that item they say that no charge was to be made. To offset this claim of $126.50, defendants present an open account for lumber, board, etc., of $121.35, less a village order of $55, and a charge of $200 for two years' services as assistant postmaster. We do not think that either party contemplated charg-ing for services at the time that they were rendered.

The account between the parties would then stand, Jordan to De Golia, Dr., judgments, $496.01; lumber, board, etc., accounts, less village order, $66.35; total, $562.36. *Contra* account, $126.50, less charge of $60 for services, $66.50; add the $100 paid since commencement of suit, making a total of $166.50, leaving a balance of

$395.86; add interest on $496.01 since date of payment of judgments, less interest on $100 since its payment, and we have a total due defendants at this date of $473.14, which is hereby declared to be a lien upon the premises described in said deed.

The complainants will have 60 days after date of decree· herein to· pay said sum, together with interest thereon, and the costs hereby awarded; otherwise said premises. may be sold to satisfy said amounts.

The decree below will be reversed, and decree entered here for defendants in accordance herewith, with costs of both courts.

The other Justices concurred.